IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

JOHNNY LYNN WOODEN     )
                                 )     Case No: 1:04-CV-234
v.                        )     COLLIER/CARTER
                                 )
JO ANNE B. BARNHARDT,     )
     Commissioner of Social Security   )

REPORT AND RECOMMENDATION

     This action was instituted pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking

judicial review of the final decision of the Commissioner denying the plaintiff a period of

disability, disability insurance benefits, and supplemental security income under Title II and

Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1382.  This matter was

referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules

of Civil Procedure for a report and recommendation regarding the disposition of the plaintiff's

motion for judgment on the pleadings (Court File No. 15) and defendant's motion for summary

judgment (Court File No. 22).

     The issues presented by the plaintiff are 1) whether the ALJ erred in rejecting the

opinions of his treating physicians, 2) whether the ALJ failed to properly consider the plaintiff's

mental impairments, and 3) whether the case should be remanded under Sentence Six of 42

U.S.C. § 405(g) to consider new evidence.

     For the reasons stated herein, I RECOMMEND the decision of the Commissioner be

REVERSED and the case remanded under Sentence Four of 42 U.S.C. § 405(g) for a re-

1

evaluation of the medical evidence pertaining to plaintiff's back and mental impairments and for a consultative examination of the plaintiff to further consider his back impairments.

## II. Background

*A. Procedural History*

At the time of the ALJ's January 30, 2004, decision, the plaintiff was a 38-year-old individual with a 12th grade education. He has the following vocationally relevant past work experience: a law enforcement officer, carpet factory worker, assembly line worker, youth center worker, and chicken farm worker (Tr. 16). The plaintiff filed his applications for a period of disability, disability insurance benefits, and supplemental security income benefits on November 15, 2001, and December 1, 2001, respectively (Tr. 16). Both claims were denied initially, upon reconsideration, and in an unfavorable decision issued by Administrative Law Judge (ALJ) Ronald J. Feibus on January 30, 2004. The plaintiff appealed his claim to the Commissioner's Appeals Council, and the Appeals Council issued a letter dated June 21, 2004, declining to review the case, thus the decision of the ALJ became the final administrative action in the case . Plaintiff now seeks judicial review under 42 U.S.C. § 405(g).

The plaintiff alleges he became disabled on July 11, 2001, due to a residual problem from a burst blood vessel in the brain, depression, and degenerative disc disease. Using the five step analysis which must be applied to a disability claim,[1] the ALJ made the following findings: (1)

---

[1]In step one, it must be determined whether the claimant is presently engaged in substantial gainful activity. If the claimant is, then he is not disabled. 20 C.F.R. §§ 404.1520, 416.920. If not, then in Step 2, it must be determined whether the claimant has a severe impairment. If not, the claimant is not disabled. *Id.* If so, then in Step 3, it must be determined whether the disability falls under the listing of impairments set forth in Appendix 1 of 20 C.F.R. § 404, Subpart P. ("Appendix 1"). *Id.* If so, then the claimant is disabled. If not, then the analysis proceeds to Step 4. *Id.* In Step 4, it must be determined whether the claimant can

2

the Plaintiff was not then engaged in substantial gainful activity, (2) the Plaintiff had severe impairments in the form of degenerative disc disease in the lumbar and cervical spines and major depression, (3) the Plaintiff's impairments did not meet or equal one of the impairments in Appendix 1, 20 C.F.R. Pt. 404, Subpart P (the Listings), (4) the Plaintiff could not perform his past relevant work and had no transferable skills, and (5) the Plaintiff retained the residual functional capacity to perform a full range of light work with the following limitations: standing and walking 6 hours in an eight hour workday, lifting and carrying 20 pounds occasionally, and lifting and carrying 10 pounds frequently. In addition, the claimant is unable to perform the following work-related activities: understand, remember, and carry out complex and some detailed instructions, and work in a high stress environment. The ALJ also found there are a significant number of jobs in the national economy which meet these restrictions (Tr. 23-24).

*B. Relevant Medical Evidence*

On July 11, 2001, the plaintiff was watching television when he developed an acute onset of severe headache and posterior neck pain and nausea. He reported to his local emergency room and was transferred to Erlanger Hospital to rule out a subarachnoid hemorrhage (Tr. 140). A lumbar puncture was performed in the Erlanger Hospital Emergency Room which revealed

---

perform his past relevant work. If so, the claimant is not disabled. *Id.* If not, then the analysis continues on to Step 5. Under Step five, even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled. *Id., see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 529 n. 3 (6th Cir. 1997) (summarizing the five steps in a disability analysis.) During the first four steps of the analysis, the claimant bears the burden of proof; this burden shifts to the Commissioner, however, at step five.") *Walters v. Commissioner of Social Security*, 127 F.3d 525, 528 (6th Cir. 1997).

grossly bloody cerebral spinal fluid (Tr. 141).  The emergency room physician concluded "[t]he

patient presents with classic symptoms of subarachnoid hemorrhage. . . lumber puncture is

consistent with subarachnoid hemorrhage." (Tr. 141).  Dr. Walter Boehm, a neurologist, was

asked to consult on the case (Tr. 141).  A bilateral cerebral angiogram and a MRI of the brain

taken in July of 2001 appeared normal (Tr. 129-30).  An MRI of the thoracic spine also

performed in July of 2001 appeared normal as well (Tr. 126).   An MRI of the cervical spine

taken about the same time revealed a small central disc protrusion at C6-7 and spondylosis at

C4-5 causing moderate spinal stenosis and bilateral foraminal stenosis (Tr. 127).  A second

bilateral cerebral angiogram performed on July 20, 2001, was normal.  Plaintiff was discharged

from Erlanger Hospital on July 21, 2001.  In his discharge notes, neurologist Walter Boehm

noted that CT scans and cerebral angiograms showed "no definite evidence" of subarachnoid

hemorrhage or aneurysm, "but lumbar puncture performed by Dr. Fesmire in the Erlanger

Emergency Room was said to be grossly bloody." (Tr. 124).  Plaintiff was to follow up with Dr.

Boehm.

A subsequent CT scan of the head performed on September 17, 2001, appeared normal (Tr. 139).

A CT scan of the spine also performed on that day showed disc space narrowing and

degenerative spurring at C4-5.  It also showed mild to moderate narrowing of the neural

foramina at C4-5 bilaterally (Tr. 138).  The radiologist's impression was degenerative disc

disease at C4-5.  *Id.*

On August 3, 2001, the plaintiff returned to Dr. Boehm.  Dr. Boehm's notes state the

plaintiff mentioned a rotator cuff on the left shoulder and that he had been on Vicodin for about

three years and "planned to have the shoulder fixed now that he has a job and insurance." (Tr.

4

123).  Dr. Boehm found the plaintiff to be bright, alert, and in no apparent distress and stated plaintiff thought he could return to work on the 13th of August (Tr. 123).  On September 7, 2001, the plaintiff returned to Dr. Boehm complaining about persistent headaches, forgetfulness, and dropping things with the right hand.  Plaintiff advised he did not return to work in August because of concerns over these problems.  Dr. Boehm noted the plaintiff appeared to be "somewhat depressed" (Tr. 122).

On August 5, 2001, the plaintiff was admitted to the Cleveland Community Hospital for depression with psychotic features and suicidal ideation (Tr. 165).  Plaintiff's wife and mother reported acute changes in mental status with increased depression, confusion, memory lapses, and crying.  He appeared depressed, sluggish and reported a decrease in activities of daily living as well as difficulty sleeping.  Plaintiff also reported tears in the left shoulder and that he had been taking Vicodin for the pain.  He reported no prior psychiatric treatment (Tr. 165).  He was diagnosed with major depression, recurrent, psychotic, with suicidal ideation (Tr. 166).  His Global Assessment of Functioning (GAF) was 30 on admission and estimated to have been 55 in the past year (Tr. 165- 66).  Intake records dated August 6, 2001, indicate that the plaintiff tested positive for benzodiazepines and opiates (Tr. 174).  He was treated on an inpatient basis until August 17, 2001, when he was discharged.  The discharge diagnosis was the same as the admitting diagnosis, and his GAF was 55 on discharge (Tr. 160).  His discharge summary stated he was still suffering from memory dysfunction, and he continued to demonstrate paranoia and remained angry and irritable with overreaction to situations and medication management.  He remained depressed and minimally involved in the treatment program (Tr. 160).  The plaintiff admitted taking up to five pills of Vicodin a day in the past two weeks for his shoulder pain (Tr.

5

161).  On discharge, he was prescribed the following medications: Celexa, Depakote-ER,

Valium, Seroquel, and Mepergan Fortis.[2]  (Tr. 160).

On September 30, 2001, a Mobile Crisis Response Team transported the plaintiff to the

Cleveland Community Hospital emergency room (Tr. 153.)  Upon intake, the plaintiff reported a

plan of shooting himself and that guns were available at the home (Tr. 153).  He also reported

auditory and visual hallucinations, constant headaches and memory loss (Tr. 153.)  The plaintiff

reported that he was taking Diazepam, Clonidine, and Vicodin[3] as prescribed by Dr. Bounds, his

primary care provider (Tr. 154-55).  The plaintiff stated voices were telling him to hurt himself

(Tr. 150).  He was released the same day after stating he no longer was having suicidal ideations

or hallucinations and after agreeing to a safety plan in which he was to make follow-up

appointments for counseling and to be closely observed by his wife (Tr. 156-57).  His GAF was

55 at discharge (Tr. 156).

---

[2] **Celexa** is used to treat major depression by boosting serotonin levels in the brain.  PDRHealth,
http://www.pdrhealth.com/drug_info/index [hereinafter PDRHealth] (last visited Sept. 5, 2005).
**Depakote ER** is prescribed to prevent migraine headaches. *Id.* **Valium** is the brand name for the
generic drug, **Diazepam**.  It belongs in a class of drugs known as benzodiazepines, and is used to
treat anxiety.  *Id.* **Seroquel** is prescribed to treat psychotic symptoms such as delusions,
hallucinations, disrupted thinking, and loss of contact with reality.  It is also used for the short term
treatment of mania associated with bipolar disorder.  *Id.* **Mepergan Fortis** is the the brand name of
the generic promethazine with meperidine. Promethazine is used to relieve nausea and vomiting.
Meperidine is an opiate drug used to relieve moderate to severe pain.  Opiates are sometimes
referred to as narcotics.  MedicineNet.com, http://www.medicinenet.com/promethazine
_with_meperidine-oral/article.htm (last visited Sept. 5, 2005).;  Division of Alchohol and Drug
Abuse, *As a Matter of Fact...Heroin and Other Opiates*, http://www.well.com/user/woa/
fsheroin.htm (last visited Sept. 5, 2005).

[3]**Clonidine** is a high blood pressure mediation also prescribed for a number of other
reasons including migraine headaches; alcohol, nicotine, or bezodiazepine withdrawal; and
Tourette's Syndrome.  PDRHealth, *supra* note 2.  **Vicodin** combines a narcotic analgesic
(painkiller) and cough reliever with a non-narcotic analgesic for the relief of moderate to
moderately severe pain. PDRHealth, *supra* note 2.

6

On October 24, 2001, the plaintiff presented himself to the Johnson Mental Health Center where he was evaluated. The plaintiff stated he was depressed, could not sleep, and cried all day. He also complained of memory loss (Tr. 181). The plaintiff reported he had had no such symptoms until suffering a burst blood vessel about four months ago. *Id*. at 181. The diagnosis was mood disorder due to general medical condition and he was given a current GAF score of 50. The clinical summary stated his level of distress was moderate and level of impairment was also moderate. Recommendations were medication management and individual therapy/counseling, and the plaintiff was released that same day (Tr. 186).

On December 9, 2001, the plaintiff was admitted to Valley Behavioral Health Services[4] in Chattanooga, Tennessee, with a diagnosis of major depression, recurrent and severe, with psychosis (Tr. 197). In addition to his psychological problems, the plaintiff complained of a torn left rotator cuff for which he said he has been taking Vicodin over the past four years for pain. A neurological examination was conducted and all findings were within normal limits. *Id*. at 197. An evaluation conducted on December 9, 2001, noted plaintiff had been having suicidal thoughts, homicidal thoughts, and hallucinations, and possible paranoia. His GAF was ranked 22 (Tr. 195). Plaintiff stated he was having no trouble with his moods until a blood vessel burst in the back of his brain in July (Tr. 194). A psychiatric history portion of the report indicates he had "a few counseling sessions at Fortwood but has not seen a psychiatrist yet." (Tr. 194). A urine screen tested positive for barbiturates, benzodiazepines, and opiates (Tr. 191). The plaintiff was discharged on December 14, 2001. The discharge summary indicated plaintiff reported

---

[4]Also referred to as "Valley Psychiatric Hospital" in the administrative record. (*See* evaluation by licensed psychologist Gary Cundiff at Tr. 235.)

hearing a voice in his mind telling him to kill himself and other people (Tr. 189, 192). He reported seeing blood and dead people (Tr. 192). However, by December 14, 2001, the plaintiff stated his headaches were gone, he was no longer hearing voices, and he no longer had thoughts of harming himself or others. It was determined he was no longer a risk of harm to himself or others and could be safely discharged. His final diagnosis was major depression, severe and recurrent. His GAF on discharge was 45. Discharge medications were Celebrex, Klonopin, Clonidine, Zyprexa, and Depakote-ER[5] (Tr. 192).

At the request of the DDS, licensed clinical psychologist William R. Boyd, Jr., Ph.D., performed a consultative examination of the plaintiff on February 22, 2002 (Tr. 204-09). At the time of the examination, "[h]e appeared somewhat depressed." (Tr. 204). Dr. Boyd concluded the plaintiff was functioning adequately in the area of activities of daily living, that he showed evidence of independent thinking and that he possessed an understanding of the cause effect relationship of his decisions. The plaintiff reported his level of performance with routine household tasks and recreational pursuits is of an acceptable standard of quality. Short term and long term memory functions appeared adequate, and he was capable of responding to a variety of instructions. He interacted in an appropriate and clear manner, gave no indication of any mental confusion, and appeared to be in no significant psychological distress (Tr. 209). Dr. Boyd's

---

[5]**Celebrex** is a nonsteroidal anti-inflammatory drug prescribed for acute pain, menstrual cramps, and inflammation of osteoarthritis and rheumatoid arthritis. PDRHealth, *supra* note 2. **Klonopin** is used alone or along with other medications to treat convulsive disorders such as epilepsy. It is also prescribed for panic disorder--unexpected attacks of overwhelming panic accompanied by fear of recurrence. Klonopin belongs to a class of drugs known as benzodiazepines. PDRHealth, *supra* note 2**. Zyprexa** helps manage symptoms of schizophrenia, the manic phase of bipolar disorder, and other psychotic disorders. PDRHealth, *supra* note 2.

8

diagnostic impressions included: 1) adjustment disorder with depressed mood, and 2) a current

GAF of 80 with GAF of 80 for the past year (Tr. 208).  The prognosis for the plaintiff's

emotional condition was "guarded."  *Id*. at 208.  It does not appear from Dr. Boyd's report that

he had medical records from the plaintiff's mental health treatment to aid him in his evaluation.

DDS non-examining medical consultant Jas P. Lester, M.D., performed a medical

evaluation of the plaintiff and concluded the following: the plaintiff's medical impairments were

not severe, either singly or combined.  Dr. Lester noted a sudden severe headache in July of 2001

but noted that testing revealed no cerebral hemorrhage (Tr. 210).

Gary Cundiff, Psy.D., a licensed psychologist, prepared an evaluation of the plaintiff on

July 15, 2002 (Tr. 233-236).  Dr. Cundiff is director of psychological services with Consultants

in Pain Management (Tr. 233).  Plaintiff reported to Consultants in Pain Management with

complaints of headaches and back, shoulder, and groin pain.  Plaintiff reported headaches began

after suffering an aneurysm on July 11, 2000, back pain began one or two years ago with no

clear precipitant, shoulder pain began about five years ago while lifting a bale of hay, and groin

pain began a few weeks ago due to a hernia.  His medications included a Duragesic patch,

Robaxin, Prozac, Lorazepam, Klonopin, and Remeron[6] (Tr. 234).  Plaintiff's effect appeared to

be moderately depressed with anxiety (Tr. 235).  There were no indications of confusion,

---

[6]

**Duragesic patches** deliver a continuous dose of the potent narcotic painkiller fentanyl for a
period of three days. PDRHealth, *supra* note 2.  **Lorezapam** is used in the treatment of anxiety
disorders and for short-term (up to 4 months) relief of the symptoms of anxiety. It belongs to a
class of drugs known as benzodiazepines.  PDRHealth, *supra* note 2.  **Prozac** is prescribed for
the treatment of major depression.  PDRHealth, *supra* note 2.  **Remeron** is prescribed for the
treatment of major depression.  PDRHealth, *supra* note 2.

disorientation or thought disorder (Tr. 234). Dr. Cundiff concluded plaintiff appeared to be experiencing a moderate degree of psychological distress and was an appropriate candidate for pain management psychotherapy (Tr. 235). Plaintiff saw Dr. Cundiff for therapy sessions on July 24, August 5, and September 24, 2002. Plaintiff reported receiving outpatient care from psychiatrist Dr. Chorost and counselor Ms. Shockley at the Johnson Mental Health Center (Tr. 235). He continued to report occasional crying spells (Tr. 232, 231, 229). On August 5th, he appeared mildly depressed (Tr. 231). On September 24th, he appeared mildly to moderately depressed (Tr. 229). Plaintiff stated Dr. Chorost at the Johnson Mental Health Center made adjustments to his psychotropic medication. As of September 24, 2002, plaintiff was taking Prozac, Zyprexa, Gabitril, and Lorazepam (Tr. 229).

On January 17, 2002, the plaintiff again admitted himself to Valley Behavioral Health Services for depression (Tr. 238). At the time of admission, his mood was "very depressed." (Tr. 238). He reported suicidal ideation with auditory hallucinations telling him to harm himself. He stated, "I'm going to blow my brains out." Effect was flat. Speech was low and monotone. He exhibited psychomotor retardation. *Id*. at 240. Memory appeared intact for immediate, recent, and remote events. *Id*. His GAF at admission was 25. Urine drug screen was positive for benzodiazepines and opiates (Tr. 239). Plaintiff was discharged on January 22, 2002, in stable condition with no suicidal or homicidal thoughts, plans, or ideation (Tr. 241). His GAF was 45. *Id*. His final diagnosis was major depression, severe, recurrent with psychosis. Discharge medications were Remeron, Zyprexa, Ambien[7], Pepcid, Depakote-ER, Klonopin, and Clonidine

---

[7]**Ambien** is used for short-term treatment of insomnia. PDRHealth, *supra* note 2.

(Tr. 241-242).  Plaintiff was to receive medication management with Dr. Chorost, individual counseling with Carol Shockely, and pain management services (Tr. 242).

Records were submitted to the ALJ from Dr. Gregory Ball with Consultants in Pain Management for the period July 1, 2002, to April 15, 2003 (Tr. 270-302).  An MRI of the lumbar spine was conducted on July 3, 2002.  Impressions were degenerative disc disease from L3-S1 with posterior disc bulging/protrusion at these levels without evidence of more than mild central canal stenosis; broad-based disc bulging at L3-4 with apparent impingement on the left dorsal root ganglion; disc bulging at L4-5 causing moderate bilateral neural foraminal stenosis with possible compression of the right dorsal root ganglion and right paracentral and central disc protrusion at L4-5 (Tr. 302).  An MRI of the cervical spine was conducted on February 4, 2003.  Impressions were moderate central canal stenosis at C4-5 secondary to retrolisthesis of C4 on C5 as well as posterior disc protrusion/spurring.  Moderate bilateral neural foraminal stenosis is seen at this level (Tr. 301).  Between January 9, 2003, and April 15, 2003, the plaintiff received six epidural block injections for pain in his back and neck (Tr. 289-299).  On July 15, 2002, the plaintiff reported to Consultants in Pain Management that he experienced constant aching and sharp pain in his back, neck, groin, and head at a level of 10 (Tr. 287).  Plaintiff gave the same report on September 24, 2002.  Reported medicines were Prozac, Lorazepam, Diazepam, and Gabitril (Tr. 283).  Progress notes dated February 25, 2003, indicated plaintiff was experiencing pain at a level 8 out of a 0-10 scale.  His plan of treatment included Percocet, Klonopin, and Flexeril[8] (Tr. 277-78).  He continued to experience depression and anxiety. *Id.*

---

[8]**Percocet,** a narcotic analgesic, is used to treat moderate to moderately severe pain. PDRHealth, *supra* note 2.  **Flexeril** is a muscle relaxant prescribed to relieve muscle spasms resulting from injuries such as sprains, strains, or pulls. PDRHealth, *supra* note 2.

11

Consultative examiner Wayne Y. Kim, M.D., a psychiatrist, performed an evaluation of plaintiff on March 20, 2003. His diagnostic impression was major depression, recurrent, and personality disorder not otherwise specified (Tr. 267). Dr. Kim reached the following conclusions: Plaintiff had no restrictions in understanding, remembering, and carrying out short, simple instructions. He had slight impairment in understanding, remembering, and carrying out detailed instructions and in the ability to make judgments on simple work-related decisions. Plaintiff had moderate restrictions in his ability to interact appropriately with the public, supervisors, and coworkers and in his ability to respond appropriately to work pressures and to changes in routine work setting. *Id.* at 268-69. Dr. Kim recommended Plaintiff continue his treatment at the mental health center and talk to his psychiatrist to see if he should increase his dosage of Wellbutrin. Dr. Kim stated he appeared somewhat melodramatic and histrionic. Dr. Kim also noted that in the interview when "confronted with the findings in his medical record, he did say that his neurosurgeon told him that he didn't have an aneurysm." (Tr. 266). There were no objective signs or symptoms of psychosis exhibited during the examination (Tr. 304). While Dr. Kim had many of the Plaintiff's current mental records at the time he completed his evaluation, he did not have records from the plaintiff's treatment at Valley Behavioral Health Services from January 17, 2002, to January 22, 2002 or the records from Consultants in Pain Management, including psychologist Gary Cundiff's evaluation (Tr. 303-04).

Scott Hodges, M.D., an orthopedic surgeon, provided a medical source statement dated October 19, 2003. Dr. Hodges opined, based on an MRI of the cervical spine on February 4,

12

2002, and an MRI of the lumbar spine on July 3, 2002, and a myelo/CT scan on October 7, 2003, that: the plaintiff could occasionally lift and/or carry ten pounds in an 8-hour work day and frequently lift and/or carry ten pounds in an 8-hour work day, plaintiff is capable of walking or standing three hours in an 8-hour work day for 30 minutes at a time, plaintiff can sit a total of three hours in an 8-hour work day for 30 minutes at a time, plaintiff can occasionally climb, balance, stoop, crouch, kneel, and crawl, and reaching is affected but handling, feeling, pushing/pulling, seeing, hearing, and speaking are not. The only environmental restrictions noted were avoiding using machinery and vibrations (Tr. 309). Dr. Hodges also averred the diagnoses in this case are confirmed by objective findings, the limitations ascribed by him to the plaintiff are normally expected from the type and severity of the diagnoses, and that his opinion was based partially on the patient's subjective complaints (Tr. 309). There were no treatment notes accompanying this medical source statement.

Plaintiff was admitted to Valley Behavioral Services again on July 21, 2003, for severe depression following an active suicide attempt (Tr. 313). His GAF on admission was estimated to be between 30 and 40 with a GAF of 40 for the past year. He was "fragile and hopeless." The following day, he was "severely depressed and hopeless," "fragile and dysfunctional," and "despondent [and] anxious." He continued to have psychotic symptoms, suicidal thoughts, and complained of voices. A urine test was "unconfirmed positive for benzodiazepines." (Tr. 314). By July 31, he denied hearing voices and was less dysphoric without psychotic symptoms. He was discharged on August 1, 2003, and denied having at that time homicidal ideation or psychotic symptoms (Tr. 314). His final diagnosis was major depression with psychotic features and chronic pain syndrome. His GAF was 60 at discharge. Medications at discharge were

Risperdal and Zoloft.[9]  He was to follow up for medical management and for case management at Johnson Mental Health Center  (Tr. 315).

Dr. Troy Daniel Gilson, Medical Director at the Johnson Mental Health Center, provided a deposition on behalf of the plaintiff on December 17, 2003. Dr. Gilson testified he personally examined the plaintiff once on September 17, 2003, and he reviewed the medical records from the Johnson Mental Health Center dating back to approximately 2001 as well as the medical records from Valley Behavioral Health Services.  Based on his examination of the plaintiff and review of the medical records, Dr. Gilson reached the following opinions: Plaintiff has a mood disorder with mixed features of bipolar type illness with psychosis and meets the requirements for the Listing of impairments under Section 12.02 and 12.04 for affective disorder bipolar and bipolar disorder (Tr. 229-30).  Plaintiff is extremely limited in his ability to engage in any sort of gainful work activity (Tr. 331).  Plaintiff's ability to carry out and to remember short, simple instructions is limited, and it would be very difficult for him to carry out detailed instructions (Tr. 331-32).  Plaintiff suffers from severe anxiety and has an extremely poor ability to interact appropriately with the public, with supervisors, and with coworkers (Tr. 332-33).  Plaintiff's ability to respond appropriately to pressures is limited, his ability to respond appropriately to changes in a routine work setting is also limited (Tr. 333).  Finally, Dr. Gilson also opined that the plaintiff's condition was permanent (Tr. 333).

---

[9]**Risperdal** is prescribed for the treatment of schizophrenia, a severe mental disorder that can cause delusions (false beliefs) and hallucinations. It is also used for the short-term treatment of mania associated with bipolar disorder.  PDRHealth, *supra* note 2.  **Zoloft** is prescribed for major depression.  PDRHealth, *supra* note 2.

At the hearing before the ALJ on January 30, 2003, the plaintiff testified to the following: He wakes up around 7 a.m. and has several cups of coffee and then begins to straighten up the house (Tr. 397). He sometimes washes dishes, washes clothes, mops, and vacuums (Tr. 394-95, 397). He must rest between chores, and sometimes he must lie down (Tr. 395). The ALJ asked the plaintiff what was the heaviest he could comfortably lift (Tr. 395). Plaintiff replied, "I have no idea." (Tr. 395). The ALJ then asked, "Twenty pounds, 30, 40, 50?" *Id.* Plaintiff responded, "Twenty, probably 20. I'd say the vacuum cleaner weighs at least 20, maybe somewhere in there." *Id.* [10] Plaintiff has panic attacks once or twice a week in which he becomes so nervous he cries and has to go into a room by himself (Tr. 398). He has not been in a store since July of 2001 when he was hospitalized for a possible subarchnoid hemorrhage because being around people makes him so nervous. He avoids family and social outings (Tr. 399- 400).

## III. Discussion

*A. Standard of Review*

Disability is defined as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §423(d)(1)(A). The burden of proof in a claim for Social Security benefits is upon the claimant to show disability. *Barnes v. Secretary, Health and Human Servs.*, 743 F.2d 448, 449 (6th Cir. 1984); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359, 361

---

[10]Plaintiff's attorney attempted to question him in greater detail about plaintiff's daily activities but was cut off by the ALJ who stated the plaintiff had already told him about his day and the "minute by minute thing isn't helping." (Tr. 397).

(6th Cir. 1978). Once, however, the plaintiff makes a prima facie case that he/she cannot return to his/her former occupation, the burden shifts to the Commissioner to show that there is work in the national economy which he/she can perform considering his/her age, education and work experience. *Richardson v. Secretary, Health and Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 28 L. Ed. 2d 842, 92 S. Ct. 1420 (1971); *Landsaw v. Secretary, Health and Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Secretary, Health and Human Servs.*, 790 F.2d 450 n. 4 (6th Cir. 1986).

*B. Analysis*

Plaintiff first avers that Dr. Gilson and Dr. Hodges are treating physicians whose opinions the ALJ improperly rejected. Plaintiff next avers that the ALJ incorrectly determined that the plaintiff did not meet the requirements of Listing 12.04, 20 C.F.R. Pt. 404, Subpt. P, App. 1. Finally, the plaintiff seeks remand to consider new evidence which was not before the

ALJ when he made his decision. Because the issues concerning Dr. Gilson and Listing 12.04 are

so closely intertwined, I shall address them together.

*1. Did the ALJ err in Refusing to Consider Dr. Gilson a Treating Physician and in Finding the Plaintiff did not Meet Listing 12.04?*

Listing 12.04 provides the following:

12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or

b. Appetite disturbance with change in weight; or

c. Sleep disturbance; or

d. Psychomotor agitation or retardation; or

e. Decreased energy; or

f. Feelings of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or

h. Thoughts of suicide; or

i. Hallucinations, delusions or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:

a. Hyperactivity; or

b. Pressure of speech; or

c. Flight of ideas; or

d. Inflated self-esteem; or

e. Decreased need for sleep; or

f. Easy distractibility; or

g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

h. Hallucinations, delusions or paranoid thinking;

Or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

And

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

Or

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Subsection A of 12.04 describes the diagnostic criteria for Listing 12.04. Subsection B and C are used to rate the severity of the impairment to determine if the claimant is disabled under the Listing 12.04. The ALJ found the Plaintiff met the requirements under Subsection A for Affective Disorders but did not meet the requirements under B or C for the degree of severity necessary to constitute a disability (Tr. 23). The ALJ found the Plaintiff was mildly impaired in completing daily activities, moderately impaired in maintaining appropriate social interaction, and moderately impaired in his ability to maintain concentration, persistence, and pace. The ALJ also found "[t]here is no indication of episodes of deterioration or decompensation in a work or work-like setting." (Tr. 23). In reaching these conclusions, the ALJ treated both Dr. Kim and Dr. Gilson as one time examiners, but he gave Dr. Gilson's opinion "little weight" while giving "great weight" to that of Dr. Kim. (Tr. 21-22). The ALJ found Dr. Gilson's opinion was unsupported by treatment notes, objective clinical data or clinical observations, and was inconsistent with the balance of the medical record.[11] (Tr. 22).

Plaintiff argues the ALJ should have treated Dr. Gilson as a treating physician because "Dr. Gilson's practice" has treated the Plaintiff for years, and Dr. Gilson reviewed his treatment records before rendering an opinion. Dr. Gilson is the Director of the Johnson Mental Health Center where the Plaintiff has received treatment since 2001. Plaintiff has provided no authority to support his position that a physician should be regarded as a treating physician solely because the medical group where he works has treated the plaintiff on several occasions. It is well settled

---

[11]Two non-examining DDS physicians provided mental evaluations for the plaintiff, (Tr. 211-228), but the ALJ gave them little weight because "they were made without benefit of the claimant's oral testimony, without a personal examination of the claimant and before additional evidence was received into the record." (Tr. 21). This decision is not contested by either party, and I do not disagree with this decision.

19

that opinions of treating physicians, because of their longitudinal history of caring for patients, are entitled to great weight and are generally entitled to greater weight than contrary opinions of consulting physicians who have examined plaintiffs only once. *Walters v. Commissioner of Social Security,* 127 F.3d 525, 529-30 (6th Cir. 1997); *Ferris v. Secretary of Health and Human Services*, 773 F.2d 85, 90 (6th Cir. 1985); *Harris v. Heckler*, 776 F.2d 431, 435 (6th Cir. 1985). *See also*, 20 C.F.R. § 404.1527(d)(2) (giving more weight to the opinions of treating sources generally). 20 C.F.R. § 404.1527(d)(2) sets forth factors to be considered: (1) the frequency of examination and the length, nature and extent of treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; and (4) whether the opinion is from a specialist. In the instant case, Dr. Gilson himself has seen the plaintiff only once. He personally has had no more interaction with the Plaintiff than Dr. Kim or Dr. Boyd. Thus I conclude the ALJ did not err refusing to consider Dr. Gilson as a treating physician.

The ALJ also rejected Dr. Gilson's opinion entirely, however, on the ground that his opinion was inconsistent with the medical evidence as a whole. I disagree with this assessment. The weight to be given the medical provider's opinion depends on the extent to which it is supported by objective medical signs and laboratory findings and to the extent that it is consistent with the record as a whole. 20 C.F.R. §§404.1527(d), 416.927(d); *accord Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 287 (6th Cir. 1994). The Commissioner may reject unsupported opinions or opinions inconsistent with other substantial evidence in the record and resolve conflicts in the evidence. *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988);

20

*Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). *See also* 20 C.F.R. §§ 404.1527(d) and 416.927(d).

The record shows that in a two year period, between August 5, 2001 and August 1, 2003, the Plaintiff reported to a hospital for psychiatric evaluation and treatment six times. Four of those times he was admitted to the hospital for inpatient psychiatric treatment. Twice he stayed for six days, once he stayed for 13 days and the last time he was hospitalized he stayed for 11 days. His GAF upon admission on these occasions was between 22 and 30.[12] His GAF on discharge after these extended hospitalizations was between 45 and 60, indicating that, while he could be released as he no longer represented a danger to himself or others, he was still experiencing significant symptoms of depression.[13] The diagnoses in these instances were severe depression, recurrent, with psychotic features. These instances would appear to constitute

---

[12]A GAF score between 21 and 30 is defined as:
Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).

*Diagnostic and Statistical Manual of Mental Disorders* at 34 (4th ed. 2000)

[13]A GAF between 41 and 50 is defined as:
Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

*Id.*

A GAF between 51 and 60 is defined as:
Moderate symptoms (e.g., flat effect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

*Id.*

repeated episodes of decompensation. In addition, they are evidence of marked difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence, or pace. The ALJ nevertheless, found "[t]here is no indication of episodes of deterioration or decompensation in a work or worklike setting." (Tr. 23). The ALJ completely discounted the Plaintiff's episodes of decompensation on the ground that Plaintiff's "exacerbations of alleged depression, accompanied by hallucinations, were likely related to his improper drug use." (Tr. 22). The ALJ noted Plaintiff tested positive for opiates in August 2001, positive for barbiturates, benzodiazepines and opiates in December 2001, and positive for benzodiazepines in July 2003, and stated "[t]here is no evidence of treatment between these hospitalizations." (Tr. 22).

Subsection B of 12.04 does not require that the episodes of decompensation occur in a work or work-like setting. The language of the regulation simply refers to episodes of decompensation. In addition, no mental health professional has opined plaintiff abused drugs or, more significantly, that plaintiff's six hospitalizations for depression with psychotic features were caused by drug abuse. Furthermore, the evidence indicates that on each occasion the plaintiff was discharged from the hospital, he was discharged with various psychotropic medications to treat his pain syndrome, his anxiety and depression, and his psychotic symptoms. While the record before the ALJ at the time of the ALJ's decision did not include out-patient treatment records from the Johnson Mental Health Center, there were frequent references in the record to the plaintiff receiving outpatient treatment from the Johnson Mental Health Center and, in particular, to a Dr. Chorost who was managing his psychotropic medication. The ALJ improperly made his own medical diagnosis when he determined that the cause of plaintiff's exacerbations in depression and hallucinations were caused by improper drug abuse.

22

> [J]udges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor. *Wilkins v. Sullivan,* 889 F.2d 135, 140 (7th Cir.1989); *Bauzo v. Bowen,* 803 F.2d 917, 926 (7th Cir.1986); *Smith v. Director,* 843 F.2d 1053, 1058 (7th Cir.1988) (dissenting opinion); *Williams v. Bowen,* 664 F.Supp. 1200, 1208 n. 17, 1209 n. 18 (N.D. Ill.1987). The medical expertise of the Social Security Administration is reflected in regulations; it is not the birthright of the lawyers who apply them. Common sense can mislead; lay intuitions about medical phenomena are often wrong.

*Schmidt v. Sullivan,* 914 F.2d 117, *118 (7th Cir. 1990); see also *Harris v. Heckler*, 756 F.2d 431, 439 (6th Cir. 1985) ("Certainly an ALJ should not substitute his own observations for professional medical opinion of record."); *Clem v. Secretary of Health & Human Services,* 1988 WL 34404, 1 (6th Cir.1988)("an ALJ may not substitute his own opinion for that of experts"); *Graham v. Bowen*, 786 F.2d 1113, (11th Cir. 1986) (requiring remand where ALJ substituted his medical conclusions for the medical evidence presented.); *Burroughs v. Massanari*, 156 F. Supp2d 1359, 1364 (N.D. Ga. 2001) (ALJ's substitution of his opinion that plaintiff suffered from "situational depression" for opinion of plaintiff's doctors was improper); *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir.1992)(Johnson, J., concurring) (finding that an "ALJ sitting as a hearing officer abuses his discretion when he substitutes his own uninformed medical evaluations for those of a claimant's treating physicians").

The ALJ completely dismissed the evidence of plaintiff's serious multiple episodes of decompensation on the ground that they were caused by a condition, drug abuse, for which a claimant cannot recover social security benefits. *See* 42 U.S.C. § 423(d)(2)(C)[14]. As previously

---

[14]42 U.S.C. § 423(d)(2)(C) provides, "An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."

discussed, the ALJ's decision to make a medical diagnosis as to the cause of plaintiff's episodes of decompensation when no mental health expert in this case has reached that medical conclusion was improper. Proper consideration of all medical evidence is especially crucial as it applies to chronic mental impairments as "[t]he results of a single examination may not adequately describe your sustained ability to function." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 - Listing of Impairments 12.00(E) which states:

> Chronic mental impairments. Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. For instance, if you have chronic organic, psychotic, and affective disorders, you may commonly have your life structured in such a way as to minimize your stress and reduce your symptoms and signs. In such a case, you may be much more impaired for work than your symptoms and signs would indicate. The results of a single examination may not adequately describe your sustained ability to function. It is, therefore, vital that we review all pertinent information relative to your condition, especially at times of increased stress. We will attempt to obtain adequate descriptive information from all sources that have treated you in the time period relevant to the determination or decision.

Dr. Kim agreed with this premise that a single examination of an individual suffering from a chronic mental illness may not give an accurate picture of the severity of the illness (Tr. 305). Furthermore, neither Dr. Boyd nor Dr. Kim had the benefit of the records from plaintiff's last eleven day stay in the hospital on July 21, 2003. Given the importance of carefully evaluating the Plaintiff's episodes of decompensation as part of the overall picture of his mental illness and the fact that the ALJ improperly and completely discounted these episodes, I conclude substantial evidence does not exist to support the ALJ's finding that the plaintiff did not meet the requirements of Subsection B of Listing 12.04. Accordingly, the undersigned will recommend that the Commissioner's decision denying benefits be reversed and the case remanded under

24

sentence four of 42 U.S.C. § 405(g) for proper consideration of the evidence pertaining to his mental impairments.

### 2. Did the ALJ err in Rejecting Dr. Scott Hodges' Opinion?

Plaintiff complains that the ALJ erroneously failed to consider Dr. Hodges a treating physician which would have given Dr. Hodges' opinion controlling weight. However, as the ALJ observed, there were no treatment notes or other notes submitted to the ALJ which would indicate that Dr. Hodges saw the plaintiff more than once. As previously discussed, absent this longitudinal aspect of the relationship between physician and patient, a treating physician who has seen the patient only once is entitled to no more deference than a one time examiner. Given that the record before the ALJ at the time he reached his decision indicated the Plaintiff had seen Dr. Hodges no more than once, the ALJ did not err in refusing to consider Dr. Hodges a treating physician.

Based on the information before the ALJ, however, Dr. Hodges was a one-time examiner and a specialist in the orthopedic field. The only other physician to offer an opinion about the Plaintiff's physical limitations was non-examining, DDS consultant, Dr. Lester, who found the plaintiff's physical limitations to be not severe. However, Dr. Lester's evaluation did not take into account the Plaintiff's degenerative disc disease as no mention whatsoever was made about it. Instead, the evaluation concentrated on plaintiff's alleged organic brain injury and his shoulder injury. Therefore, the only medical opinion concerning the limitations placed on the Plaintiff by his degenerative disc disease is Dr. Hodges' opinion which places the plaintiff at a sedentary exertional level but concludes Plaintiff can work only six hours out of an eight hour work day. The ALJ rejected Dr. Hodges' opinion for several reasons: 1) Dr. Hodges' opinion

was based partially on the plaintiff's subjective complaints, and clinical or objective evidence such as sensory changes or muscle weakness in the arms or legs was lacking to substantiate the plaintiff's subjective complaints, 2) the claimant testified he could lift twenty pounds contradicting Dr. Hodges' limitation of ten pounds, and 3) there were no conclusive findings of nerve root compression at L3-S1.

The ALJ's decision completely discounts the July 3, 2002, MRI which found broad-based disc bulging at L3-4 with apparent impingement on the left dorsal root ganglion and disc bulging at L4-5 causing moderate bilateral neural foraminal stenosis with possible compression of the right dorsal root ganglion and right paracentral and central disc protrusion at L4-5 (Tr. 302). The ALJ also opined that lack of sensory changes or muscle weakness in the plaintiff's arms or legs contradicted Dr. Hodges' opinion as to the plaintiff's limitations. No other medical personnel, however, has offered such an opinion, and the ALJ is not a medical expert who is qualified to make medical diagnoses, as previously discussed. As to the plaintiff's testimony about how much he could lift, the plaintiff testified he did some vacuuming in the mornings and he could lift his vacuum which probably weighed 20 pounds. This testimony is also insufficient to contradict an medical expert's opinion, based on an examination and a review of relevant MRIs, that the plaintiff can only occasionally lift ten pounds. It is not at all clear from the plaintiff's testimony how often he lifted the vacuum in one day and the term "occasionally" has generally been thought to encompass up to one third of the time and no more than two hours of an eight hour work day. *See e.g., Reese v. Commisioner of Social Security*, 2000 WL 1434585 *2 (6th Cir. 2000). Thus I conclude the plaintiff's testimony, either singly or combined with the other reasons offered by the ALJ, did not provide substantial evidence for the ALJ to reject the

only expert medical opinion regarding Plaintiff's limitations caused by his back impairments. In so finding, I conclude the record is not sufficiently developed on the issue of Plaintiff's back impairment, and I will recommend the Commissioner's decision be reversed, and the matter remanded under sentence four of 42 U.S.C. § 405(g) for proper consideration of the evidence and a consultative examination to determine the full extent of the plaintiff's limitations due to his back impairment.

*3. Should this Case be Remanded Under Sentence Six to Consider New Evidence?*

In addition to his other arguments for remand, the plaintiff asserts he has new, material evidence in the form of records from Dr. Hodges, Dr. Ball, and Volunteer Behavioral Health Care Systems which justifies remand of this case under Sentence Six of 42 U.S.C. § 405(g). However, it is unnecessary to address this issue as this new evidence can be considered when the case is remanded under Sentence Four of 42 U.S.C. § 405(g) for a further and proper evaluation of the medical evidence as discussed herein.

IV. Conclusion

For the reasons stated herein, it is RECOMMENDED[15] the Commissioner's motion for summary judgment be DENIED and the Plaintiff's motion for judgment on the pleadings be GRANTED to the following extent:

(1) the Commissioner's decision denying benefits be REVERSED,

(2) the case be REMANDED under Sentence Four of 42 U.S.C. § 405(g) in order that the evidence presented in this case can be properly evaluated. In so doing, the Commissioner shall allow the plaintiff to supplement the record with additional evidence, and

(3) the Commissioner obtain a consultative examination from an orthopedic physician who can then provide an opinion concerning the plaintiff's limitations caused by his back impairments.

s/William B. Mitchell Carter
UNITED STATES MAGISTRATE JUDGE

---

[15]Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).